```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
    META MOORE,                                             :
                                                            :
                                Plaintiff,                  :
                                                            :   **MEMORANDUM DECISION AND**
                -against-                                   :   **ORDER**
                                                            :
    UNCLE GIUSEPPE'S MARKETPLACE,                           :   22-cv-544 (BMC)
    SMITHTOWN UNCLE GIUSEPPPE'S, INC.,                      :
    and SCOTT KANTER,                                       :
                                                            :
                                Defendants.                 :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

Taking plaintiff's version of the facts as true in this employment discrimination action, defendant employer, Uncle Giuseppe Marketplace and its subsidiary or franchisee (collectively, "Uncle Giuseppe"), had an employee, defendant Scott Kanter, who made a comment about lynching plaintiff, who is black, in front of plaintiff and other employees. Plaintiff reported the incident to her employer, and within about a week, most of which plaintiff spent on a previously-scheduled vacation, Kanter was fired, but plaintiff never returned to work and never inquired about the resolution of her complaint. Under these circumstances, no reasonable jury could find that defendants violated federal law, and the Court declines to exercise supplemental jurisdiction over plaintiff's state-law claims.

## BACKGROUND

Uncle Giuseppe operates a chain of supermarkets in New York, New Jersey, and Connecticut. Plaintiff was hired to work as a deli clerk at Uncle Giuseppe's Melville, New York location around July 2019. When she commenced work, she was provided with Uncle

Giuseppe's Anti-Harassment Policy and Complaint Procedure. Around February 2020, plaintiff was transferred to Uncle Giuseppe's Smithtown, New York location.[1]

At the Smithtown location and at the time of plaintiff's transfer, Kanter was employed as a Kitchen Manager. He was not in plaintiff's reporting line and was not plaintiff's supervisor. He had no authority to fire her, promote her, give her work-related directions, set her schedule, evaluate her work performance, or affect her benefits.[2]

Late on Saturday, August 8, 2020, plaintiff contacted Gary Bretton, who was a Closing Store Manager, and told him that Kanter had threatened to lynch her. She was very upset. Bretton reported the incident to the Store Manager, James LoCascio, either that evening or the next morning, August 9. Bretton told plaintiff that he had reported the incident to LoCascio, and asked plaintiff if she had reported the incident to HR. Plaintiff responded that she had – she left a voicemail for an HR coordinator named Ashley Vivo on August 9. On Monday, August 10, the first business day after the incident, LoCascio brought in Francesca Costantino, the HR Manager, who began an investigation.

Plaintiff returned to work on August 9, not inquiring whether Kanter would be there, and was surprised and terrified to find that he had not been removed. The next day, August 10, plaintiff began a previously-scheduled vacation. On August 11, while on vacation, Vivo called

---

[1] Defendants' Rule 56.1 statement mistakenly dates plaintiff's transfer at February 2021 (and plaintiff mistakenly admitted this).

[2] Plaintiff's responses to defendants' Local Rule 56.1 statements, as well as her own statement of "facts," are less than unhelpful. For example, she claims the statement above is "disputed" because Kanter had "carte blanch [sic] authority … to terrorize Ms. Moore and degrade the terms and conditions of Ms. Moore's employment with racist violence … ." That statement is not only circular, but is also argumentative, and does not dispute the factual averment that Uncle Giuseppe set forth. It has no place in a Rule 56.1 statement. I am therefore disregarding it, as I am disregarding much of plaintiff's Rule 56.1 submissions that consist of argument, opinion, and inadmissible evidence rather than statements of fact supported by record evidence. My Individual Practice Rules, consistent with Local Rule 56.1 itself, specifically caution attorneys not to do what plaintiff's counsel has done here and plaintiff's counsel has simply ignored that prohibition, rendering her submissions all but useless. It is all the more egregious because the need to comply with Rule 56.1 in this manner was specifically discussed with plaintiff's counsel at the premotion conference.

plaintiff for an interview and following the interview, at Vivo's request, plaintiff wrote a follow-up email summarizing what she had told Vivo. The email stated:

> To inform you of comments that were made that were racial and inappropriate & made me uncomfortable from Scott the kitchen chef[.] He made a comment to me and the manager Of the deli Jason saying he was fine with the inequalities that african americans face, and what was wrong with, as well as an example of how black people get profile and white people don't, on 8-8-2020....he came to the sandwich dept where I was making a sandwich for a customer and my co workers, Jerry (asst.deli mn'ger), Miguel rivera, chris scholl were present and Scott came in there area and blurted out "SO YOU SAY WE'RE GONNA LYNCH HER"!! We were quiet for a moment then it went into a joke, I tried to shake it off, but it really bother me, I was made to feel uncomfortable, and unsafe, the next day Scott came and apologized for his "off color comment" he said but the damage was already done, Miguel rivera also mentioned scott asked him did he think that I was mad about the comment that he made, and miguel proceeded to tell him he just can't go around and say things like that. This email is to make you aware of the unsafe working conditions that I am dealing with there[.]

Vivo's notes of the conversation were generally consistent with but more substantial than plaintiff's follow-up email. According to those notes, plaintiff reported that Kanter "always makes comments that are inappropriate." When Vivo inquired when that had started, plaintiff responded "when the BLM movement started. He would make comments here and there about the movement and black people." Vivo asked for examples, and plaintiff gave three. First, Kanter said his parents don't refer to black people as black people but called them a different (presumably racist) name, which Kanter said he didn't see a problem with. Plaintiff told Vivo that she "shrugged that off" because she knew Kanter "is not the best with conversation and doesn't think ahead."

Second, Kanter said that if "a white guy in a suit" is pulled over, then a "cop does nothing and he can have a kilo of drugs in the car," but "then you have Tyrone with corn [rows] in a hoodie" and "cops think he is prone to search [because] he's black." Kanter said there wasn't

anything wrong with that because "if something isn't broke, don't try to fix it." Plaintiff again ignored the comment because Kanter "says things out of line and out of no-where."

Third, Kanter would keep "making comments on the protest."

Vivo asked plaintiff if management was aware of any of this or if plaintiff had made a formal complaint and plaintiff said she had not, but had asked the Deli Manager, Jason Contreras, if Kanter was racist because "he makes all these comments." Contreras said he didn't think so, but he thought Kanter "just doesn't think before he talks."

Vivo's notes then set forth how, according to plaintiff, Kanter initiated the incident on August 8 at about 4 pm "that just crossed the line." Plaintiff described how three workers were making sandwiches when Kanter came up pushing a cart and said out of nowhere "So you say we're gonna lynch her?" Everyone remained silent. Plaintiff replied, "what did he just say?" She tried to "laugh it off and ignore it" but could not. The next day, Kanter tried to apologize and while plaintiff at first thought he might have been sincere, when she found out that one of the other employees who had been present, Miguel Rivera, had suggested to Kanter that he should apologize, she was less convinced of Kanter's sincerity.

Vivo's notes show that the call concluded with plaintiff saying she would "hate to see someone fired but something had to be done," and she was contemplating not coming back to the store because of the incident.

Between August 9 and August 16, 2020, Uncle Giuseppe interviewed eight other employees as part of its investigation of plaintiff's complaint. Kanter was one of those employees; he was interviewed on August 13. At least one of the other employees, Rivera,

acknowledged hearing Kanter's remark and substantially corroborated plaintiff's account. On August 14, Uncle Giuseppe terminated Kanter.[3] On August 15, plaintiff resigned.

Plaintiff then commenced this lawsuit. Her amended complaint states one combined claim for racial discrimination and hostile work environment against Uncle Giuseppe and Kanter under 42 U.S.C. § 1981; a second claim for retaliation under § 1981 against Uncle Giuseppe and Kanter; and then repeats those same two claims under the New York State Human Rights Law.

## DISCUSSION

### I. Section 1981 Claims

#### A. Hostile Work Environment

To show a hostile work environment under § 1981, a plaintiff must produce proof of incidents directed to a protected characteristic that are "more than episodic; they must be sufficiently continuous and concerted in order to be pervasive. Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015) (cleaned up). There are both subjective and objective components to evaluating a hostile work environment claim – a plaintiff must perceive the environment as abusive based on its abusive characteristics, but must show that a reasonable person would also so perceive the environment. See Littlejohn v. City of New York, 795 F.3d 297, 321 (2d Cir. 2015).

Plaintiff's argument that she meets this standard is two-pronged. First, she argues that Kanter's "lynching" comment is so severe that, in and of itself, it imposed a hostile work environment on her. Second, she asserts that there are factual issues as to whether Kanter is a

---

[3] Plaintiff asserts that Uncle Giuseppe could not have terminated Kanter before August 20 because that is when it formally concluded its investigation of the incident. The record is clear that he was terminated on August 14, notwithstanding that the final report was issued six days later.

supervisor so that his comment is imputed to Uncle Giuseppe *ipso facto*. Neither argument holds water.

I will assume *arguendo*, as some district courts within this Circuit have suggested, that "severe and pervasive" may mean "severe *or* pervasive" so that if a single discriminatory comment is so far beyond even the rough-and-tumble language of the workplace that federal civil rights law simply will not tolerate it, then the single remark may give rise to a hostile work environment. See Dash v. Bd. of Educ. of City School Dist. of N.Y., 238 F. Supp. 3d 375, 385-86 (E.D.N.Y. March 3, 2017). The record shows clearly that Kanter's utterance had the requisite subjective impact on plaintiff, terrifying her. As far as objective assessment, it is obvious that the racism-laden history of "lynching" is precisely what motivated Kanter to utter the question within plaintiff's hearing. Moreover, unlike his earlier disparaging remarks about black protests, his implication that his parents used racist language to describe black people, and discriminatory treatment of black drivers by police officers (none of which he had a problem with), this one was directed personally at plaintiff. It was an invitation, joking or not, said to a group of non-black employees suggesting violence towards plaintiff in a manner that had historically been directed at blacks.[4]

However, plaintiff's case is lacking one crucial element. She has shown that the remark was "hostile" and that it was made at "work," but because Uncle Giuseppe came down on Kanter like the wrath of God, there was no "environment." In all of the cases where courts allowed the possibility that a single outrageous remark could constitute a hostile work environment (in fact, those cases are usually dictum, as the outrageous comments in those cases were repeated), the

---

[4] Plaintiff's opposition to defendants' motion continually seeks to play up the severity of Kanter's pre-lynching remarks. The record just does not support the characterization in her brief. As plaintiff acknowledged to Vivo, these were just asinine statements by Kanter that even plaintiff did not take overly seriously. Moreover, plaintiff flat-out admitted in her deposition that she did not complain to Contreras or anybody else about these statements.

plaintiff had to labor under the ongoing gaze of or additional improper remarks by the coworker or supervisor who had made the remarks for a protracted time. See Cadet v. Alliance Nursing Staffing of N.Y., Inc., 632 F. Supp. 3d 202, 232 (S.D.N.Y. 2022). Here, Uncle Giuseppe's response was so fast that it had Kanter fired the day after it interviewed him, which was two days after it interviewed plaintiff, which was two or three days after the incident.

Plaintiff complains there are issues of fact as to whether Uncle Giuseppe acted quickly enough, but I see no way a reasonable jury could find that it had a duty to have acted sooner. The incident occurred late in the afternoon on Saturday, August 8, plaintiff's complaint hit Human Resources on August 9, and HR started its investigation on the first business day after plaintiff's report, on Monday, August 10. Uncle Giuseppe could hardly fire Kanter until it had debriefed plaintiff and Kanter – it debriefed plaintiff while she was on vacation on August 11; Kanter on August 13; and it then fired Kanter on August 14. To the extent plaintiff is contending that Uncle Giuseppe should have fired Kanter immediately upon hearing her report, that is simply not reasonable. Even boors should be given a prompt opportunity to have their story heard.

At most, plaintiff is arguing that she endured unnecessary suffering because she and Kanter both showed up at work on August 9, when Kanter gave his insincere apology, and plaintiff did not expect that. However, if we are going to extend the reach of § 1981 to allow a single, albeit severe, racist comment to constitute a hostile work environment, then the environment must extend more than one work shift, lest the employer become little more than an insurer for the conduct of its employees.

As to plaintiff's argument that Kanter was a "supervisor," I have previously rejected that as having no support in the record whatsoever.[5] See supra n. 2.

**B. Discrimination**

The parties dispute one factor of the *prima facie* showing that plaintiff must make to raise an issue of fact at stage one of the familiar McDonnell Douglas analysis (see generally Ruiz v. Cnty. of Rockland, 609 F.3d 486, 491-92 (2d Cir. 2010)) – did she suffer an adverse employment action? Uncle Giuseppe's position is that it terminated Kanter with reasonable speed and that the only reason plaintiff was exposed to him for one day before she took her scheduled vacation was because she didn't ask if he would be at work that day, nor did she simply leave when she saw he was there. Indeed, if plaintiff had returned to work after her vacation, she would have found Kanter permanently gone. Plaintiff contends she was "constructively discharged" because a reasonable person could not bear to appear at work after having Kanter ask other employees if "we're gonna lynch her?"

Of course, as both sides acknowledge, a constructive discharge can constitute an adverse employment action. See Fitzgerald v. Henderson, 251 F.3d 345, 357 (2d Cir. 2001). But it is not easy to show a constructive discharge. A plaintiff must show that the employer "*intentionally* create[d] an intolerable work atmosphere that force[d] [the plaintiff] to quit involuntarily." Anderson v. Rochester City Sch. Dist., 481 F. App'x 628, 632 (2d Cir. 2012) (emphasis added); see also Petrosino v. Bell Atl., 385 F.3d 210, 230-31 (2d Cir. 2004).

---

[5] Plaintiff does not reference Kanter's earlier racist comments (BLM protests, parents' use of racial slurs, or discrimination against black drivers) in support of her § 1981 claim, relying solely on the "lynching" comment. To the extent she intended to rely on the totality of the remarks to show a hostile work environment, the earlier remarks are of little weight. As plaintiff acknowledged to Vivo, none of those remarks affected her sufficiently to satisfy even the subjective prong for a hostile work environment. None of these prior comments were directed at her personally, none of them involved either of their working conditions, and plaintiff took no action regarding any of them beyond asking Contreras if he though Kanter was racist.

It is also true that a constructive discharge still has to be a discharge – that is, it has to be a situation that results from the acts or omissions – usually the omissions – of the employer to remedy the intolerable working conditions. In other words, the focus is on the conduct, or lack of conduct, of the employer. See Spence v. Md. Cas. Co., 995 F.2d 1147, 1156 (2d Cir. 1993). For the same reasons discussed above regarding my rejection of plaintiff's hostile work environment claim, there is little more Uncle Giuseppe's could have done beyond its prompt investigation and subsequent discharge of Kanter. The timing simply does not admit to it.

This is crucial because under the fourth factor for a *prima facie* case of McDonnell Douglas, a plaintiff must demonstrate that the adverse employment action occurred under circumstances giving rise to an inference of intentional racial discrimination. See Cordell v. Verizon Comms., Inc., 331 Fed. App'x 56, 58 (2d Cir. 2009). That is consistent with the fundamental requirement of § 1981 that a plaintiff must demonstrate the employer's intent to discriminate on the basis of race. See Lauture v. Int'l Bus. Machs. Corp., 216 F.3d 258, 261 (2d Cir. 2000).

In other words, the degree of misconduct required by § 1981 is not ordinary negligence, but rather intentional discrimination. See id. If plaintiff thinks Uncle Giuseppe was a day or two too slow in its termination of Kanter, that's not enough. For even if we were to extend the requirement of intentional racial discrimination to encompass gross neglect or willful blindness by ignoring blatant acts of racial discrimination, no reasonable jury could find an express or implicit bias in Uncle Giuseppe's treatment of plaintiff's complaint. There is not a single manager that plaintiff can point to as harboring racial bias or even displaying dilatory conduct in pursuing her complaint. Her opposition to defendants' motion is silent as to who should have done what faster. She merely says someone should have done something faster.

In addition, although Uncle Giuseppe had a duty to promptly investigate and resolve plaintiff's complaint, plaintiff has great difficulty in asserting a constructive discharge when she came into work on the first business day after she made her complaint – without having inquired if Kanter would be there – and then never looking back to find out what happened. Had she simply asked before the end of her short vacation, she would have found out that the cause of the alleged constructive discharge – Kanter – had been "deconstructed," *i.e.*, Kanter had been fired. What was the point of filing a complaint against Kanter and not even checking back before she returned from vacation a few days later to see if her complaint had been addressed?[6]

This was not a constructive discharge – it was a voluntary resignation. No reasonable jury could find otherwise.

**C. Retaliation**

Plaintiff conflates her discrimination claim with a retaliation claim and thus has little more to offer to support the latter. Her argument identifies no specific protected activity except her complaint about Kanter's "lynching" remark, and concludes that Uncle Giuseppe's failure to undertake a "reasonable" investigation was in retaliation for her having made that complaint.

---

[6] Plaintiff cites two out-of-circuit cases for the proposition that a threat of immediate violence can itself constitute a constructive discharge. Those cases don't help her at all because the facts are so much more egregious than those at issue here. See Patton v. Keystone RV Co., 455 F.3d 812 (7th Cir. 2006) (over the course of one month, male supervisor made charged comments to employee, stalked employee, and engaged in four instances of physical contact with employee, including running his hand all the way up employee's inner thigh, under her shorts, until he touched her underwear, at which point employee was able to break contact); Brooms v. Regal Tube Co., 881 F.2d 412 (7th Cir. 1989) (supervisor engaged in repeated instances of grossly offensive conduct and commentary, including showing extremely offensive photograph to female employee, grabbing her arm when she attempted to seize a copy, and threatening to kill her).

Moreover, although not essential to this decision, it is highly unlikely that a reasonable jury could find that Kanter was actually soliciting co-employees who just happened to be standing there to lynch plaintiff by asking if "we're gonna lynch her?" I accept that plaintiff subjectively felt at risk, but objectively, which is also part of the test, Kanter was just a racist fool who was trying to cause plaintiff distress. That is not at all what happened in Patton or Broom, where the employees' supervisors actually laid hands on them in a sexually aggressive manner despite their resistance.

Having determined as a matter of law that the investigation was reasonable, plaintiff's retaliation claim fails.[7]

## II. New York State Human Rights Law Claims

The dismissal of plaintiff's § 1981 claims means that there are no longer any pending federal claims in this action. In that circumstance, when dismissal of federal claims occurs on summary judgment, the "default rule" is that state law claims should be dismissed without prejudice to refiling in state court. As the Second Circuit has stated, "we have repeatedly said that 'if a plaintiff's federal claims are dismissed before trial, the state law claims should be dismissed as well.'" Oneida Indian Nation of New York v. Madison Cnty., 665 F.3d 408, 437 (2d Cir. 2011) (quoting Brzak v. United Nations, 597 F.3d 107, 113-14 (2d Cir. 2010) (cleaned up)).

There is no reason to retain supplemental jurisdiction of plaintiff's New York State Human Rights Law claims. Looking at the factors in Carnegie-Mellon University v. Cohill, 484 U.S. 343 (1988), there is no inconvenience to either side in having their trial in state court. Indeed, the interest of comity strongly suggests it. Id. at 350. It is a local case – a dispute between local supermarket and one of its employees, and as plaintiff has repeatedly emphasized, the New York State Human Rights Law was amended in 2019 to differentiate it from federal civil rights law, and reduce the burden of proof necessary for a plaintiff to prevail. See McHenry v. Fox News Network, LLC, 510 F. Supp. 51, 68 (S.D.N.Y. 2020). Accordingly, this Court

---

[7] Plaintiff's opposition makes a perfunctory reference to needing more discovery. This issue was discussed at the premotion conference, in which it emerged that she had not taken all the depositions she had wanted to, despite having months to do it, purportedly as a result of various disputes that the parties were having. The Court advised plaintiff's counsel at that conference that if defendants submitted evidence on the motions that plaintiff's counsel had not seen or to which she needed discovery to respond, it would hold the motions in abeyance. Plaintiff has identified no such evidence in defendants' motions, and because the Court is construing all of the facts in her favor to the extent they are supported by evidence, plaintiff has not made the showing required by Rule 56(d).

declines to exercise supplemental jurisdiction over plaintiff's claims under the New York State Human Rights Law.

## CONCLUSION

Defendants' motions to dismiss [41, 43] are granted. Plaintiff's claims under 42 U.S.C. § 1981 are dismissed with prejudice and her claims under the New York State Human Rights Law are dismissed without prejudice to refiling in state court.

**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.

Dated: Brooklyn, New York
September 27, 2024